J. RICHARD MANNERS ET AL., APPELLANTS, v. CITY OF
WAHOO, A CORPORATION, APPELLEE, CHICAGO,
BURLINGTON & QUINCY RAILROAD COMPANY,
A CORPORATION, INTERVENER AND APPELLEE.

45 N. W. 2d 113

Filed December 15, 1950. No. 32854.

*H. A. Bryant,* for appellants.

*Joseph L. Pallat* and *William T. Gleeson,* for appellee.

*Myrl D. Edstrom, J. W. Weingarten,* and *W. P. Loomis,* for intervener and appellee.

Heard before SIMMONS, C. J., MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, as residents and owners of abutting or adjacent real property in Wahoo, a city of the second class, brought this action to enjoin the city from letting contract for and levying special assessments to pay the cost of paving certain streets therein pursuant to ordinance No. 585, purportedly enacted under authority of section 17-512, R. S. 1943. By leave of court, the Chicago, Burlington, and Quincy Railroad Company, also owner of property affected, intervened, seeking similar relief. After hearing upon the merits, the trial court entered its decree finding and adjudging the issues generally in favor of defendant and against plaintiffs and intervener. Motions for new trial were overruled, and plaintiffs appealed, assigning substantially that the judgment was not sustained by the evidence but contrary thereto, and contrary to law. We sustain the assignment.

The right of plaintiffs to maintain the action and the legal formalities in enacting the ordinance are not questioned. The sole question is not one of expediency but rather whether or not, under the facts and circumstances, the city had any power and authority to create paving districts Nos. 28 and 30 under the provisions of section 17-512, R. S. 1943.

In that connection, section 17-509, R. S. 1943, empowers governing bodies of cities of the second class

and villages to pave or otherwise improve their streets and pay therefor by special assessments levied upon the property especially benefited thereby, proportionate to benefits. However, the exercise of such power is expressly limited by the proviso, reading: "Provided, that none of the improvements hereinbefore named shall be ordered except as provided in sections 17-510 to 17-512." By virtue of such limitation of power, this court has concluded that the streets of a city of the second class or village can be paved and so paid for only by legally following one of the three factually applicable methods provided in said sections. Garver v. City of Humboldt, 120 Neb. 132, 231 N. W. 699; Musser v. Village of Rushville, 122 Neb. 128, 239 N. W. 642.

Under section 17-510, R. S. 1943, action of the governing board in such respect may be initiated by petitions signed by 60 percent of the resident owners of directly abutting property.

Under section 17-511, R. S. 1943, the governing body of the city or village may, by ordinance without petition, create paving districts and publish notice thereof, whereupon a majority of the resident owners of directly abutting property may, within a prescribed period, file objections and prevent such paving.

At this point it should be said that in June 1949, the city council of Wahoo, concededly acting under section 17-511, R. S. 1943, aforesaid, created paving districts Nos. 28 and 30 by enacting ordinance No. 579, which included all of the streets here involved except Locust from First to Fifth, whereupon more than a majority of resident owners of property directly abutting thereon filed objections, and the ordinance was repealed.

Nevertheless, in August 1949, the council, purportedly acting under section 17-512, R. S. 1943, enacted ordinance No. 585, creating paving districts Nos. 28 and 30, respectively, including therein streets formerly included in ordinance No. 579, and adding thereto Locust from First to Fifth Street.

In that connection, section 17-512, R. S. 1943, gives the city council power, by three-fourths vote of all its members, to enact an ordinance creating a paving district without a petition therefor, "upon any main thoroughfare that connects with or forms a part of the state highway system." If such a factual situation exists, they have the power to contract for such improvement and levy assessments on the lots and parcels of land abutting on or adjacent to such street or streets especially benefited thereby in such created district in proportion to such benefits to pay the cost of such improvement. Exercise of the power, however, as heretofore seen, is dependent upon the construction and factual application of that portion of the statute above quoted.

An examination of the record discloses that State Highway No. 92 and U. S. Highways Nos. 77 and 30-A, enter the city from the east on Twelfth Street, thence go west to Chestnut, thence south to First, where No. 77 continues south on Chestnut, but Nos. 30-A and 92 go west out of the city on First Street, passing Locust, the last street open on the south which terminates at its intersection with First Street. The city route of highways Nos. 92, 77, and 30-A, goes south from Twelfth Street over Linden to Fifth, thence west to Chestnut.

Ordinance No. 585 generally described paving district No. 28 as extending on Fifth Street from the west line of Walnut, a north and south street one block west of Chestnut, then across Sycamore and Locust, north and south streets, to the east line of Laurel, a north and south street not yet open at the south end. The district was also extended on Locust from the north line of First Street to the south line of Eighth, an east and west street, and on Sixth, an east and west street, from the west line of Sycamore two blocks west of Chestnut, to the east line of Locust. Paving district No. 30 commenced at the south end of the south terminus of Washington about a block north of Eighth Street and pro-

ceeded north for a short block to the north line of Block 2 in Remington's Addition.

Ordinance No. 585 itself simply determined "that the streets within said districts, and said districts generally, connect with and are part of the State Highway system," without finding therein that any of them were a "main thoroughfare," and the record conclusively discloses that in fact they were not. The record affirmatively discloses that the paving project was in fact primarily undertaken to handle a drainage problem on the west side, which the council figured could only be handled through creation of such a project, anticipating that Washington-Locust could be made a "main street."

Locust is an ordinary north and south graveled street, without stop signs or any other directions for traffic upon it except as it enters First Street. There were no business establishments located thereon except a greenhouse and two residents who transacted some business from their property. The properties abutting upon it were empty lots and parcels of ground or homes, all generally of lesser comparative value. Traffic upon it was mostly by local residents traveling to and from their homes and to softball games once or twice a week during the summer. It was not in any sense a "main thoroughfare that connects with or forms a part of the state highway system." It was simply an ordinary side street which ended by joining a state highway on the south. Fifth Street had more traffic of like character upon it, and Sixth had less than Fifth, but each had more than Locust. In the aforesaid situation, it naturally follows that they were both simply side streets intersecting Locust, which was not a "main thoroughfare," on the west, and intersecting Chestnut, a state highway, on the east. To hold otherwise would permit the city to so pave any side street intersecting a state highway, which the Legislature clearly never intended to permit.

Washington is simply a continuation of Locust Street

north from Eighth Avenue, a short block north of Eighth Street, to the Luther College campus. Concededly, Locust-Washington is in fact a continuous single street, which, by stipulation, terminates at the south edge of the Luther College campus, where "it does not connect with any main thoroughfare nor highway nor street at the north end of said Washington Street."

In the construction and application of the very statute here involved, this court has held in Garvey v. City of Humboldt, *supra*: "Powers conferred upon municipal boards by legislative charter will not be extended beyond the plain import of the language used therein.

"Statutes empowering municipal boards to perform certain functions will be strictly construed, and all doubt will be resolved against the exercise of the power, rather than in favor of it.

"Under the law of this state, a city council cannot, by enactment of an ordinance, extend its powers beyond the limits prescribed in its charter."

In Musser v. Village of Rushville, *supra*, such holdings were reaffirmed, and it was held that the three methods prescribed by the statutes aforesaid were each "mandatory and jurisdictional, and unless the governing boards of such municipalities act within one of the three prescribed methods, no valid assessment can be made against property to pay the costs of such improvement."

Bearing the foregoing in mind, we are so bound by the particular relevant language used in the act. Such language is: "upon any main thoroughfare that connects with or forms a part of the state highway system." By no stretch of construction or application of such language could it be said, under the facts appearing in this record, that the streets in districts Nos. 28 and 30 formed any part of the state highway system. The remaining words are then "upon any main thoroughfare that connects with * * * the state highway system." In that connection, it will be noted that the Legislature

did not use the words "upon any main street that intersects a state highway."

The Legislature used the word "main" as an adjective modifying "thoroughfare." As so used, "main" ordinarily means principal, primary, chief, or most important comparatively in size, extent, use, or utility for traffic. 54 C. J. S., Main, p. 897; 38 C. J., Main, p. 333; 26 Words and Phrases, Main, p. 51, and also alphabetically in the Cumulative Annual Pocket Part; Black's Law Dictionary (3d ed.), p. 1142; Webster's New International Dictionary (2d ed.), p. 1483. In that regard, the mayor of the city, a witness for defendant, testified that Locust Street, included in district No. 28, was not even a main street and never had been, but added, "I think it can be made a main street."

It will be observed, however, that the Legislature did not use the words "main street" but did use the words "main thoroughfare." The term "thoroughfare" itself, as ordinarily defined, means, "A passage through, as from one street or opening to another; an unobstructed way open to the public; a public road or street open at both ends; esp., a street or way through which there is much passing." Webster's New International Dictionary (2d ed.), p. 2631. As legally defined: "The term means, according to its derivation, a street or passage through which one can fare, (travel;) that is, a street or highway affording an unobstructed exit at each end into another street or public passage. If the passage is closed at one end, admitting no exit there, it is called a 'cul de sac.'" Black's Law Dictionary (3d ed.), p. 1728. In 3 Bouvier's Law Dictionary, Rawle's Third Revision, p. 3270, a thoroughfare is defined as: "A street or way opening at both ends into another street or public highway, so that one can go through and get out of it without returning. It differs from a *cul de sac*, which is open only at one end." See, also, 41 Words and Phrases, Thoroughfare, p. 586, and alphabetically in the Cumulative Annual Pocket Part; 62 C. J., Thoroughfare, p. 926.

In the light of the foregoing, it is apparent that Locust-Washington, one continuous street, although open on the south end, was not only not a main street, but was closed at the north end, which made it a "cul de sac," and not a "thoroughfare." Upon either horn of defendant's dilemma, Locust-Washington was not even a "thoroughfare" much less a "main thoroughfare." Further, the statute did not include any street which simply touches or intersects a state highway as argued by defendant, but specifically provides that it must be a "main thoroughfare that connects * * * with the state highway system," in order to give primary streams of traffic to or from the city or village a suitable passage to or from a state highway.

Fifth and Sixth Streets, a part of which were each respectively included in the purported paving districts, were simply side streets running west from Chestnut to Laurel and Locust respectively, neither of which is a main thoroughfare nor part of a main thoroughfare.

Clearly, under section 17-512, R. S. 1943, the city had the power to create paving districts only upon a street or streets which constitute a main thoroughfare that connects with the state highway system, or upon a main thoroughfare which actually forms a part of the state highway system. We conclude that none of the streets involved herein come within the construction and factual application of said section, therefore the city council was without any power and authority to act thereunder.

For the reasons heretofore stated, the judgment of the trial court should be and hereby is reversed and the cause remanded, with directions to enter a judgment for plaintiffs and intervener as prayed.

REVERSED AND REMANDED WITH DIRECTIONS.

CARTER, J., participating on briefs.